**ZARCO EINHORN SALKOWSKI, P.A.**
Robert Zarco (pro hac vice)
rzarco@zarcolaw.com
Robert M. Einhorn (pro hac vice)
reinhorn@zarcolaw.com
Michael D. Braunstein (pro hac vice)
mbraunstein@zarcolaw.com
2 S. Biscayne Blvd., 34th Floor
Miami, FL 33131
305.374.5418

**LATHROP GPM LLP**
Laura Reathaford (CA SBN 254751)
laura.reathaford@lathropgpm.com
2049 Century Park East, Suite 3500S
Los Angeles, CA 90067
310.789.4600

Attorneys for Defendants and Counter-Claimants

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARIA LUZ ZUCCHELLA,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>OLYMPUSAT, INC, et al.,<br><br>　　　　　Defendants.<br>_____<br>AND RELATED COUNTER-CLAIM. | Case No. 2:19-cv-07335 DSF (PLAx)<br><br>*Assigned to the Honorable Dale S. Fischer, Courtroom 7D*<br><br>**DEFENDANTS' AND COUNTER-CLAIMANTS' OFFER OF PROOF REGARDING IMPEACHMENT EVIDENCE CONCERNING PLAINTIFF'S 'ME TOO' WITNESSES**<br><br>Complaint Filed:　　July 15, 2019<br>Counterclaims Filed:　October 25, 2019<br>Trial:　　　　　　　September 12, 2023 |

# OFFER OF PROOF

In its January 10, 2023 Order Granting in Part and Denying in Part Motions *in Limine* and Defendants' Request to Strike [DE 464], the Court requested a written offer of proof addressing the information upon which Defendants intend on cross-examining certain of Plaintiff's witnessed about, to wit: Plaintiff's 'Me Too' witnesses, Adriana Herran, Alexandra Aguilar, and Kimberly Reed. *See* [DE 464], at pp. 8-9. This filing responds to the Court's request.

## I.   Relevant Issues Before the Court

The issues before the Court in relation to the instant Offer of Proof arose out of the Court's consideration of Plaintiff's Motion *in Limine* No. 2, which sought to preclude Defendants from introducing highly-relevant evidence concerning the credibility of certain witnesses that Plaintiff intends to rely upon for purported 'me too' evidence.

Because, as of the time of this filing, Defendants do not know exactly what testimony Plaintiff intends on eliciting from Ms. Herran, Ms. Aguilar, or Ms. Reed, Defendants are not able to identify every possible area of inquiry it may seek to explore on cross-examination of these witnesses. However, Defendants identify the following points that they intend to raise on cross-examination with the aforementioned witnesses, each of which directly relate to the witnesses' respective credibility.

Credibility of witnesses is always at issue, particularly in sexual harassment cases. The Supreme Court has held that "[t]he gravamen of any sexual harassment claim is that the alleged sexual advances were unwelcome." *Meritor Savings Bank v. Vinson,* 477 U.S. 57, 68 (1986) (citations and internal quotation marks omitted). In many cases, "the question whether particular conduct was indeed unwelcome presents difficult problems of proof and turns largely on credibility determinations committed to the trier of fact." *Id*.

Challenging a witness's credibility through cross-examination and documentary evidence demonstrating the party's motive to provide false testimony is fundamental to a party's ability to impeach adverse witnesses. *See United States v. Abel,* 469 U.S. 45, 52 (1984) ("Proof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."); *United States v. Hankey,* 203 F.3d 1160, 1171 (9th Cir. 2000) ("Evidence is relevant . . . if it has a mere tendency to impeach a witness' credibility by a showing of bias or coercion."); *Lewy v. S. Pac. Transp. Co.,* 799 F.2d 1281, 1298 (9th Cir. 1986) ("[Plaintiff] was entitled to introduce evidence of [witness'] bias both by cross-examining her and through presentation of extrinsic evidence . . . ."). This credibility evidence, therefore, is admissible. *Hankey*, 203 F.3d at 1171 ("The point of a bias inquiry is to expose to the jury the witness' special motives to lie, by revealing facts such as . . . personal animosity or favoritism towards the defendant.").

Accordingly, Defendants should be permitted to cross-examine Plaintiff's witnesses as to issues pertaining to their credibility, including the following areas of inquiry, each of which are highly-relevant in this case—which relies heavily on various witnesses' allegations of events they purportedly heard or witnessed.

### A. Adriana Herran[1]

Ms. Herran worked for Olympusat until she tendered her resignation in August of 2019. *See* Herran Depo., at 310:17-20. Plaintiff was almost never present in the West Palm Beach, Florida office, so Ms. Herran did not ever interact with her very much. *See* Herran Depo., at 318:13-19. During the early years of her employment with Defendants, Ms. Herran had a consensual relationship with Mr. Mohler. *See* Herran

---

[1] Excerpts of the deposition of Adriana Herran were attached to Plaintiff's Motion *in Limine* No. 2 [DE 346-2].

Depo., at 257:25-258:5. Ms. Herran voluntarily sent Mr. Mohler pictures and videos of herself. *See* Herran Depo., at 345:21-24; 346:9-14.

Ms. Herran previously testified under oath that there had been no domestic violence or sexual violence between Tom and herself. *See* Herran Depo., Ex. 36. Defendants intend to cross-examine Ms. Herran regarding multiple times that she has found to be lying or otherwise not credible by several judges in other proceedings, and Ms. Herran's motive in making false allegations against Mr. Mohler in view of the ongoing contentious custody dispute in which she has offered conflicting testimony. Such matters undoubtedly bear directly upon Ms. Herran's credibility at the trial in the instant matter. Defendants also intend to cross-examine Ms. Herran as to certain threats and intimidation by Ms. Herran's father toward Mr. Mohler at the direction of Ms. Herran.

During the bulk of Ms. Herran's deposition, Ms. Herran's answers were evasive, incomplete, and subject to a litany of improper, boilerplate objections and instructions not to answer relevant questions—by both counsel for Plaintiff and separate counsel for the witness. Defendants should be permitted to inquire as to the matters affecting the witness's credibility, bias, and motives in pursuing and maintaining a consensual relationship with Mr. Mohler over an extended period of time.

Information concerning Ms. Herran's personal motives in pursuing and entering into a consensual relationship with Mr. Mohler and other men is relevant to whether or not she pursued and/or consented to such relationships. Likewise, Ms. Herran voluntarily sending Mr. Mohler pictures and videos of herself and welcoming gifts and other benefits from Mr. Mohler is highly-probative as to whether the alleged conduct and attention complained of—if true—was welcome. The proposed evidence concerning Ms. Herran's potential perjury in family Court goes directly towards her credibility at trial and the jury's determination of the weight to give her testimony. *See*,

*e.g.*, *Tennison v. City & Cnty of San Francisco*, 2005 WL 89008, at *2 (N.D. Cal. Jan. 12, 2005) (noting that evidence of lying "would be relevant to credibility").

Accordingly, Defendants should be permitted to cross-examine Ms. Herran on these matters that bear directly upon her credibility and bias in this matter.

**B. Alexandria Aguilar[2]**

Ms. Aguilar worked for Defendants over a period of three years. *See* Aguilar Depo., at 19:15-18. Ms. Aguilar never met Plaintiff. *See* Aguilar Depo., at 93:11-21; 172:21-23. Ms. Aguilar likewise never witnessed Plaintiff being harassed, nor did she speak with Plaintiff about harassment. *See* Aguilar Depo., at 125:4-16; *see also* [DE 464], at p. 33. She was hired for the role of personal assistant and caregiver to Mr. Mohler's children. *See* Aguilar Depo., at 22:4-8. During this time, Ms. Aguilar left the company multiple times but voluntarily came back when other opportunities did not work out for her. *See* Aguilar Depo., at 114:17-20; 118:1-8; 119:6-9. Indeed, when Ms. Aguilar worked for **another company** in 2018 for a couple of months, she felt like she was "spoke[n] to [] like garbage" and that "[i]t was a hostile work environment." *See* Aguilar Depo., at 117:15-21. This evidence is relevant to prove the contention that Ms. Aguilar may be difficult to work with or have a hard time taking direction, as opposed to some unique, oppressive behavior exhibited by Defendants.

While in Ms. Aguilar's care, Ms. Aguilar took Mr. Mohler's minor child to bars to consume alcoholic drinks. *See* Aguilar Depo., at 156:25-157:11. Ms. Aguilar does not dispute this fact and merely claimed that she "doesn't remember" if she ever took Mr. Mohler's minor child out drinking. *See* Aguilar Depo., at 168:10-12. Ms. Aguilar also obtained and provided to Mr. Mohler's minor child "juul" vaporizers—a product

---

[2] Excerpts of the deposition of Alexandria Aguilar were attached to Plaintiff's Motion *in Limine* No. 2 [DE 346-4].

that cannot be used or purchased by minors.[3] *See* Aguilar Depo., at 160:21-162:14; Ex. 63. On one instance, Ms. Aguilar signed Mr. Mohler's minor daughter out of school so she could travel to New York to visit a boyfriend without Mr. Mohler's consent. *See* Aguilar Depo., at 162:15-21.  Text messages from Ms. Aguilar demonstrate that she encouraged and directed Mr. Mohler's minor child to lie to Mr. Mohler, and Ms. Aguilar even went as far as drafting text messages for the child to send to Mr. Mohler to assist her in lying to her father.  This evidence goes directly to Ms. Aguilar's credibility, truthfulness, and bias after Mr. Mohler discovered her inappropriate conduct.

As it relates to interactions between Ms. Aguilar and Defendants, Ms. Aguilar invited Mr. Mohler to join her and a friend in Key West, Florida for her 30th birthday. *See* Aguilar Depo., Ex. 56. Ms. Aguilar voluntarily sent Mr. Mohler photographs of her in a bikini. *See* Aguilar Depo., at 145:4-24; 146:10-21. Ms. Aguilar referred to Mr. Mohler as the "best boss ever." *See* Aguilar Depo., Ex. 60. Ms. Aguilar did not consider whether her conduct was interpreted by Mr. Mohler that Ms. Aguilar wanted to be in his presence. *See* Aguilar Depo., at 142:1-9.  This testimony bears directly on the veracity of her allegations.  Ms. Aguilar has also noted that she has "an extreme hatred toward Mr. Mohler." *See* Aguilar Depo., at 114:23-24. Such evidence would go directly towards any bias held by Ms. Aguilar towards Defendants and would be probative of her credibility as a witness as to the events Plaintiff purports to rely.

Ms. Aguilar voluntarily sending Mr. Mohler pictures and videos of herself and welcoming gifts and other benefits from Mr. Mohler is highly-probative as to whether the alleged conduct and attention complained of—if true—was welcome. Likewise, the proposed evidence demonstrating Ms. Aguilar lying to Mr. Mohler and advising

---

[3] On at least one instance, Ms. Aguilar and Mr. Mohler's minor child were seen at a bar vaping and drinking alcohol. *See* 164:14-165:18.

his underage daughter to do the same goes directly towards her credibility at trial and the jury's determination of the weight to give her testimony. *See*, *e.g.*, *Tennison*, 2005 WL 89008, at *2 (noting that evidence of lying "would be relevant to credibility").

Accordingly, Defendants should be permitted to cross-examine Ms. Aguilar as to these matters pertaining to her credibility and bias, as well as matters relating to whether her behavior evidenced that she welcomed any of the alleged conduct complained of.

**C. Kimberly Reed[4]**

Ms. Reed was a long-time employee of Olympusat and its affiliates since 1999. *See* Dec. 27 Reed Depo., at 10:20-22. Ms. Reed had a consensual short-term sexual relationship with Mr. Mohler around the year 2000. *See* Dec. 27 Reed Depo., at 13:14-22; Feb. 16 Reed Depo., at 313:3-8. After the personal relationship ended, Ms. Reed continued her employment without issue. *See* Feb. 16 Reed Depo., at 221:12-18. Ms. Reed never claimed any type of sexual harassment or improper conduct by Mr. Mohler during or after the relationship. *See id*. In the mid-2000s, Ms. Reed was promoted to a c-suite executive. *See* Dec. 27 Reed Depo., at 16:3-9. In 2014, Ms. Reed left the company. *See* Dec. 27 Reed Depo., at 29:3-4. Accordingly, Ms. Reed did not witness any wrongful conduct by Defendants during the applicable time period—as set forth in the pertinent statutes of limitations. *See Tennison v. Circus Circus Enters., Inc.*, 244 F.3d 684, 689 (9th Cir. 2001) ("The alleged instances of harassment and complaints did not involve Plaintiffs and they occurred five years before the statute of limitations cut-off date . . . ."). Likewise, Ms. Reed did not witness any conduct by any of the Defendants that would give rise to claims under FEHA within the state of California. *See* Feb. 16 Reed Depo., at 266:17-267:5.

---

[4] Excerpts of the deposition of Kimberly Reed were attached to Plaintiff's Motion *in Limine* No. 2 [DE 346-10].

1  During her employment with Olympusat, Ms. Reed had an intimate relationship
2  with a subordinate employee, Raul Acosta and she admits to engaging in sexual
3  relations with Mr. Acosta on work trips. *See* Dec. 27 Reed Depo., at 39:18-23l; Feb.
4  16 Reed Depo., at 228:13-16. Ms. Reed did not consider her behavior of having sexual
5  relations with a subordinate employee during a work trip to be inappropriate. *See* Feb.
6  16 Reed Depo., at 263:6-17; 298:19-25. Ms. Reed did not personally witness any
7  behavior purportedly complained about by Raul Acosta. *See* Dec. 27 Reed Depo., at
8  44:6-15; 51-2:7; Feb. 16 Reed Depo., at 235:14-20; 237:14-25; 245:8-16. Ms. Reed
9  likewise never witnessed Mr. Mohler or anyone employed by Defendants acting
10 improperly or harassing towards Ms. Jade Valentini, nor three women that Mr. Mohler
11 had consensual relationships with during the time that Ms. Reed worked for
12 Defendants. *See* Feb. 16 Reed Depo., at 272:24-273:17; 276:13-281:18. Indeed, none
13 of these women ever told Ms. Reed that they experienced any sort of harassment or
14 inappropriate conduct. *See* Feb. 16 Reed Depo., at 335:3-336:3 Following the
15 conclusion of her employment, Ms. Reed and Olympusat became involved in a
16 contentious lawsuit, which lasted approximately 6 years. *See* Feb. 16 Reed Depo., at
17 216:10-217:21. Due to the lengthy lawsuit, Ms. Reed has personal animosity not only
18 towards Defendants, but also towards its counsel. *See* Feb. 16 Reed Depo., at 220:22-
19 24 (Ms. Reed referring to Defendants' lead trial counsel as "a douche bag"); 300:17-
20 19 (using expletive language towards Defendants' counsel).

21  Ms. Reed never saw Mr. Mohler and Plaintiff together. Feb. 16 Reed Depo., at
22 287:11-13. This is despite the fact that Plaintiff and Ms. Reed's employment
23 overlapped by a period of 14 years—which shows both how little contact there was
24 between Mohler, who worked at the same location as Ms. Reed, and Plaintiff, as well
25 as the different "work environments." Ms. Reed never witnesses any harassing conduct
26 towards Plaintiff at any time. *See* Feb. 16 Reed Depo., at 288:4-18.

27
28

During the company events that Ms. Reed attended, Ms. Reed consumed alcohol. *See* Feb. 16 Reed Depo., at 294:13-16. At times, Ms. Reed consumed alcohol to the point of being drunk. *See* Feb. 16 Reed Depo., at 305:8-13. During her tenure with the company, Ms. Reed agreed that Mr. Mohler was very generous and treated employees very well. *See* Feb. 16 Reed Depo., at 307:11-17.

All of Ms. Reed's purported testimony is based on hearsay and not things she personally heard or saw, which the Court has identified as inadmissible. *See* [DE 464], at p. 33 ("The Court agrees but notes that only individuals who actually heard such statements (not merely heard of them) may testify about them."). Accordingly, Defendants should be permitted to cross-examine Ms. Reed to determine whether she personally experienced any of the statements alleged, or "merely heard of them" through hearsay sources.

Each of these issues are highly probative of Ms. Reed's ability to accurately recall the events upon which testimony Plaintiff purports to rely for the proposition that such events actually occurred. *See, e.g.*, *McCarthy v. Koenig*, 2021 WL 2115339, at *2 (N.D. Cal. May 25, 2021) (possibility of an alcohol abuse problem "could call into question the credibility of [the witness'] testimony"); *Parra v. City of Chino*, 141 F.3d 1178 (9th Cir. 1998) (evidence of alcohol use at or near the time of events in question "had probative value because it related to [the witness'] credibility and ability to remember"). Likewise, the fact that Ms. Reed did not personally hear or see such alleged events is undoubtedly important to both the admissibility and weight that the jury should ultimately give the same. Finally, while Plaintiff intends to offer Ms. Reed's testimony to support the notion that Mr. Mohler and Olympusat engaged in some sort of improper conduct in the workplace, the fact that Ms. Reed also engaged in a consensual sexual relationship with a subordinate employee would provide counter-evidence any claim that Ms. Reed believed that Mr. Mohler's similar consensual relationships with certain employees over the years was somehow improper

by its very nature. Accordingly, Defendants should be permitted to explore these topics during cross-examination of Ms. Reed.

## II.     CONCLUSION

For the foregoing reasons, Plaintiff's Motion *in Limine* No. 2 [DE 346] should be denied, and the Court should permit Defendants to cross-examine the aforementioned witnesses on the matters affecting their credibility.

Dated: January 30, 2023

ZARCO EINHORN SALKOWSKI, P.A.

By: */s/ Michael D. Braunstein*
Robert Zarco
Robert M. Einhorn
Mary Nikezic
Michael D. Braunstein
Co-Counsel for Defendants and Counter-Claimants

LATHROP GPM LLP

By: */s/ Laura Reathaford*
Laura Reathaford
Counsel for Defendants and Counter-Claimants